Roland RIDDELL, Plaintiff,

v.

RIDDELL WASHINGTON CORP., et al., Defendants.

Civ. A. No. 87–0928.

United States District Court, District of Columbia.

Nov. 18, 1987.

Laurence C. Ochs, Washington, D.C., for plaintiff.

Calvin H. Cobb, Jr., Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

### THOMAS F. HOGAN, District Judge.

Plaintiff filed the present action on April 3, 1987, alleging various acts of fraud and conspiracy allegedly committed by defendants in a scheme to defraud him. Specifically, plaintiff alleged in his original complaint that defendants violated sections of the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. §§ 1961–1968; engaged in common law fraud and conspiracy to defraud; violated local law governing the sale of collateral, D.C.Code § 28:9–504; engaged in common law conversion; breached contract; breached fiduciary duties; and wrongfully transferred shares of his stock.[1] Presently before the Court is defendants' motion for summary judgment which raises the statute of limitations, as well as addresses the merits of the case. In consideration of defendants' mo-

tion and supporting memoranda, the opposition thereto, the copious depositions and affidavits filed by both sides, oral argument, and the entire record of the case, the Court, for the following reasons, finds that plaintiff's cause of action is barred by the statute of limitations and grants defendants' motion for summary judgment.

### I. *Factual Setting*

Plaintiff Roland Riddell brought this action against two wholly family-owned corporations, Riddell Washington Corporation ("RWC") and Riddell Properties, Inc. ("RPI"), and various members of his own family.[2] The facts underlying the cause of action have their genesis in the spring of 1978. Plaintiff sought a $150,000 loan from Security National Bank ("the Bank"). Plaintiff needed the money to keep his mortgage banking company, of which he was president, afloat. Roland Riddell Deposition at 30 ("Roland Dep.").[3] In an attempt to secure the loan, plaintiff obtained an appraisal by Joseph Donnelly ("Donnelly appraisal") of the properties owned by RWC and RPI.[4] The plaintiff admits he

---

1. The Court granted leave to plaintiff to file an amended complaint on October 6, 1987. The defendants filed their motion for summary judgment on August 19, 1987. Obviously, the defendants' motion for summary judgment addressed the claims as they appeared in the original complaint. In fact, plaintiff, after the granting of two extensions, filed his opposition on September 18, 1987 addressing the issues as drawn in the original complaint. The amended complaint elaborates on the nature of the claims, includes other defendants into claims stated in the original complaint and adds two counts, Count II—alleging fraud in the sale of securities in violation of the Securities Exchange Act—and Count V—replevin. Furthermore, the amended complaint alters the nature of the count alleging breach of fiduciary duty to include Robert Arthur and Sally Arthur who, along with Jean Riddell, plaintiff alleges breached their fiduciary duty to plaintiff when they allegedly failed to inform plaintiff of a rent increase. The Court did grant leave to file an amended complaint; yet the Court is concerned that the summary judgment memoranda addressed the issues as drawn in the original complaint. The Court determines that the outcome of the statute of limitations issues would be the same under the original complaint, as well as the amended complaint. Because the summary judgment motion was drawn in keeping with

the original complaint, the Court shall address the issues in accordance with the original complaint.

2. Specifically, plaintiff sues his mother, Jean Riddell, his sisters, Joan Baer, Marise Reynolds and Sally Arthur, his brother-in-law, Robert Arthur.

3. Plaintiff is a savy business person involved in the real estate business since the early 1960's. Roland Dep. at 5–12. Specifically, plaintiff has been running or owning his own mortgage banking company since 1974. *Id.* at 8. Prior to that time, plaintiff worked in similar business concerns. *Id.* at 8–10. Furthermore, plaintiff admits to working for Riddell Realty to "learn the real estate business" and to sell real estate. *Id.* at 11.

4. The principal asset of RWC from 1978 through 1986 was a piece of real estate at 1730 K Street, N.W., in the District of Columbia. The principal asset of RPI for the same period was real estate at 1776 K Street, N.W., in the District of Columbia. Both properties were encumbered by 99 year ground leases, providing for a basic rent effective for 22 years which would be renegotiated every 10 years. The renegotiated rents would be a percentage of the appraised value of the land as determined every ten years. Given

secured the Donnelly appraisal to value his own stock.[5] Roland Dep. at 44–45. The Donnelly appraisal valued the properties, subject to the applicable ground leases, at $1,257,000 (1730 K Street) and $597,000 (1776 K Street). As a condition of the loan, the bank required plaintiff to pledge his family stock in RWC and RPI and obtain a "bid/buy-back" agreement from the corporations wherein the corporations committed to purchasing plaintiff's stock in the event of default and foreclosure.

At plaintiff's request, a special meeting of the shareholders of RWC and RPI was held on December 29, 1978. Plaintiff proposed the bid/buy-back provision to the shareholders and the shareholders refused to consent to the agreement. Plaintiff's sister, Sally Arthur, urged plaintiff to not pledge his stock for the bank loan. Sally Arthur Aff. ¶ 7. In fact, she informed plaintiff that the rents would increase significantly in 1981 when the rents would be renegotiated. *Id.* Sally Arthur told plaintiff that in light of the expected increased income, the dividends to shareholders would increase and the corporations would be in a better position to entertain the possibility of loaning the money to the plaintiff. *Id.*[6] Plaintiff ignored this advice and stressed the urgency of his need for the money and his willingness to sell his stock to outsiders. Jean Riddell Aff.

¶ 8; Sally Arthur Dep. at 25. Thereupon, Jean Riddell, plaintiff's mother, offered to loan the $150,000 to plaintiff. Plaintiff executed a 90–day promissory note to his mother in January, 1979, secured by his stock in RWC and RPI. Plaintiff failed to pay the note when due in April, 1979. Jean Riddell claims she informed plaintiff in the early summer of 1981 of her intent to foreclose on the note. Plaintiff claims he never received notice.[7] Jean Riddell foreclosed on the note in the summer of 1981. Buchanan & Co. performed in October, 1981, a valuation analysis ("Buchanan valuation"). The Buchanan valuation set a range of values for the stock. On November 22, 1981 the shareholders of RWC and RPI met and voted that the corporations should purchase the stock from Jean Riddell for $106,936. Plaintiff maintains he learned of the sale to the corporation in the late winter of 1982 or the early spring of 1983. Roland Dep. at 33.[8] At that time, plaintiff admits to seeing the Buchanan valuation. Roland Dep. at 35. Evidence exists which plaintiff does not refute that plaintiff expressed his displeasure in early 1983 with the sale of the stock to the corporation and the price for which the corporation purchased the stock. Jean Riddell Dep. at 13–14; Jean Riddell Aff. ¶ 7; Marise Reynolds Aff. ¶¶ 6–10; Joan Baer Aff. ¶ 7; Roland Dep. at 66.[9] Eventually, the corpora-

that these properties represented virtually the sole assets of the companies, an appraisal of the properties essentially amounted to an appraisal of the stock.

5. The Donnelly appraisal on its face stated the date on which the rental prices would increase and the fact that the renegotiated rents would be based on a percentage of the land value of the property. Thus, plaintiff was on notice of the fact that the rents would increase from an appraisal he himself obtained. Plaintiff's attempt to avoid acknowledgment of his notice by stating that the Donnelly appraisal was in the hands of the corporations since 1979 does not alter the fact that plaintiff secured the Donnelly appraisal and read its contents in 1978. Thus, plaintiff was on notice as to the value of the property in 1978 and as to the expected increase in rental payments.

6. Nowhere in plaintiff's materials supporting his opposition to the summary judgment motion does plaintiff rebut Sally Arthur's statements.

7. This dispute is irrelevant because the note by its terms provided that the holder essentially could foreclose with or without demand, advertisement or notice.

8. Jean Riddell claims around Christmas 1981 she showed the Buchanan valuation to plaintiff and informed him of the sale of what was formerly his stock to the corporation. Jean Riddell Dep. at 13. For the purposes of this motion for summary judgment, defendants accept plaintiff's testimony that he discovered the sale to the corporation in the late winter of 1982 or early spring of 1983. In fact, defendants, for the purposes of the statute limitations issue, accept all of plaintiff's statements.

9. Plaintiff claims that the conversations with Joan Baer and Marise Reynolds were to heal broken relationships which plaintiff stated arose out of the sale of the stock. Roland Dep. at 66–67, 93–94, 96–97. Plaintiff's reasons for the conversations are irrelevant. The admission of the conversations and complaints regarding

tions sold the properties on December 31, 1986 for $13 million. In February, 1987 plaintiff learned of the sale and instituted suit on April 3, 1987.

## II. *Standard of Review for Summary Judgment Motions*

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." The United States Supreme Court recently provided significant guidance as to those circumstances when summary judgment is appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986); *Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court stated that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issues of *material* fact." *Anderson*, 106 S.Ct. at 2510 (emphasis in original). The party moving for summary judgment has the burden of demonstrating that there is no genuine issue of fact. *Id.* at 2514. The party opposing the summary judgment motion, however, must present "affirmative evidence" in order to defeat a properly supported summary judgment motion. *Id.* The Court shall grant a properly supported summary judgment motion if the moving party demonstrates a lack of genuine triable issues of material fact. *Celotex*, 106 S.Ct. at 2555.

In the present case, the sole issue presently before the Court is when plaintiff's cause of action accrued triggering a requirement to exercise due diligence to investigate the transactions of which plaintiff complains. In the context of the running of the statute of limitations in a cause of action for fraud, summary judgment is appropriate in circumstances that demonstrate a plaintiff's failure to exercise due

diligence upon acquisition of sufficient knowledge to amount to the accrual of a claim. *See Bender v. Rocky Mountain Drilling Associates*, 648 F.Supp. 330, 335 (D.D.C.1986); *see also Maggio v. Gerard Freezer & Ice Company*, 824 F.2d 123, 128 (1st Cir.1987); *Gieringer v. Silverman*, 731 F.2d 1272, 1277 (7th Cir.1984) (citing cases in which federal courts granted summary judgment for failure to satisfy due diligence requirement under statute of limitations).

## III. *Accrual of RICO and Fraud and Conspiracy Claims*

The statute of limitations period for plaintiff's RICO claim accrues on the date the plaintiff "discovered or, should have discovered through the exercise of reasonable diligence, the fraudulent activity in question." *Bender*, 648 F.Supp. at 334 (quoting *Cross v. Price Waterhouse & Co.*, [1982–83 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,153 at 95,568 (D.D.C.1983)). Likewise, plaintiff's claims of fraud and conspiracy to defraud accrue when the plaintiff "ascertain[ed], or with the exercise of due diligence should [have] ascertain[ed], the material facts upon which the claim is based." *Hartford Life Insurance Company v. Title Guarantee Company*, 520 F.2d 1170, 1174 (D.C.Cir.1975). In the event the plaintiff did not actually discover the alleged fraud, as is the situation presently before the Court, the Court inquires whether " 'storm warnings' of the possibility of fraud trigger[ed] a plaintiff's duty to investigate in a reasonably diligent manner." *Maggio v. Gerard*, 824 F.2d at 128. The Court conducts an objective inquiry to determine if the plaintiff possessed such knowledge as would alert a reasonable investor to the possibility of fraud. If the Court determines that the plaintiff possessed sufficient knowledge to trigger the due diligence requirement, the Court examines the circumstances of the case to determine whether plaintiff actually exercised due diligence. *Id.; see also Bender*, 648 F.Supp. at 335 (United States District Court for the District of Columbia grants

the transaction demonstrate that plaintiff knew of the transactions and was unhappy with the

transactions. He, however, never bothered to update his own appraisal he had done in 1978.

summary judgment based on failure to bring cause of action within statute of limitations); *Gieringer*, 731 F.2d at 1277.

Plaintiff attempts to argue that defendants fraudulently concealed facts that prevented him from discovering the alleged fraud. These actions, plaintiff claims, should toll the statute of limitations. In this jurisdiction, the Court does not address a claim of fraudulent concealment if the Court finds that the plaintiff was on notice of the wrongs of which he complains. *Bender*, 648 F.Supp. at 335 (citing *Foltz v. U.S. News & World Report, Inc.*, 627 F.Supp. 1143, 1150 (D.D.C.1986)). In the context of fraudulent concealment, notice consists of either 1) when a plaintiff is apprised of facts unique to a claim (actual notice) or 2) when a plaintiff has not exercised due diligence in conducting an inquiry upon knowledge of facts that indicate a possibility of a cause of action (inquiry notice). *Foltz*, 627 F.Supp. at 1150. In a related argument, plaintiff appears to argue that under a general doctrine of equitable tolling, the statute of limitations is tolled. The doctrine of equitable tolling is not applicable if a plaintiff has a reasonable basis to suspect a wrong and fails to exercise due diligence to investigate the matter. *Bender*, 648 F.Supp. at 335.

In a final attempt to toll the statute of limitations, plaintiff vigorously argues that defendants owed plaintiff a fiduciary duty to explicitly inform plaintiff of the increase in the properties' rent of the buildings and the accompanying increase of value in the stock. In a case closely analogous to the present case, the First Circuit held that even if defendants owed plaintiff a fiduciary duty, the plaintiff was not excused from inquiring into facts that plaintiff admitted he knew. *See Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 129 (1st Cir.1987). In *Maggio*, plaintiff, against his family's advice, sold his stock in a family corporation back to the corporation in April, 1972. At the time of the sale, plain-

tiff's stock represented 12% ownership of the corporation. Under a 1964 stock repurchase agreement drafted by plaintiff's father, plaintiff's stock eventually would represent one third of the corporation once the corporation repurchased stock owned by plaintiff's uncles and cousin. Plaintiff brought suit in September, 1985 when plaintiff claimed he discovered the 1964 stock repurchase agreement. The First Circuit held that plaintiff's failure to investigate the possibility of fraud in the 1972 sale in light of facts known to plaintiff in 1972 demonstrated a lack of due diligence.[10] Specifically, the *Maggio* court stated that "plaintiff had ample information at his disposal to suggest that his stock was worth significantly more than the amount offered by Gerard Freezer and that the offer may have been an attempt to defraud him ... [such that] a reasonable investor would have proceeded carefully and sought to learn more." *Maggio*, 824 F.2d at 129.

The *Maggio* facts are closely analogous to the facts presently before the Court. Both cases involve family owned and operated businesses in which the corporation repurchased stock. Both plaintiffs brought suit many years after the transactions transpired which underlie the basis for the claims. Both cases involve the nature of plaintiff's knowledge which might give rise to a due diligence requirement. Like plaintiff in *Maggio*, plaintiff in the case at bar admits to possessing knowledge of certain events. Specifically, Roland Riddell admits to knowing in the late winter of 1982 or the early spring of 1983 that his stock had been foreclosed upon and sold to the corporation. Complaint ¶ 24; Roland Dep. at 33, 93, 97, 121, 128–29. Plaintiff also believed that the price for which the corporation purchased the stock was too low, a complaint which he voiced to various defendants. Roland Dep. at 100, 124; Jean Riddell Dep. at 14; Joan Baer Aff. ¶ 7;

---

**10.** The facts which plaintiff admitted knowing at the time of the sale included the following: his father's intent that the uncles' and cousin's stock return to the corporation; his father's intent that control pass to the plaintiff and his brothers; and his family's objections to his sale of the stock in 1972. *Maggio*, 824 F.2d at 128–29.

Marise Reynolds Aff. ¶¶ 6–10.[11] Similar to the facts in *Maggio*, evidence exists that at the meeting on December 29, 1978, Sally Arthur advised plaintiff to not borrow the money because the rents would increase leading to more liquidity of the corporation and increased dividends. Sally Arthur Aff. ¶ 7.[12] Plaintiff does not refute that Sally Arthur gave this advice.

Furthermore, plaintiff secured the Donnelly appraisal in 1978 which valued the properties underlying the stock at $1,854,-000. Roland Dep. at 43. In 1983, he saw the Buchanan valuation which set out the various values for the stock. Roland Dep. at 126, 129. If plaintiff was unhappy in 1983 with the valuation of the stock and the sale price of the stock he could have requested his own appraisal, as he had done in 1978, or requested corporate financial statements, a course of action plaintiff admits he did not pursue. Roland Dep. at 48–49. Moreover, plaintiff's assertion that he could rely on his mother, who was president of the corporations, and her statements of the values and financial condition of the company does not excuse plaintiff from exercising due diligence once the storm clouds gathered indicating that potential fraud existed. *See Maggio*, 824 F.2d at 129 (relationships of trust and confidence do not excuse plaintiff from exercising due diligence when plaintiff possesses sufficient knowledge to indicate a potential claim). Finally, the Court does not find persuasive plaintiff's claim of naivete as to the real estate market in Washington, D.C. Although plaintiff claims to be involved solely in residential real estate in Virginia, plaintiff was highly knowledgeable as to real estate in general, having worked in the field since the early 1960's. *See supra* note 3 (detailing plaintiff's employment history in mortgage banking and real es-

tate).[13] As a matter of law, a reasonable business person with both plaintiff's general knowledge of the real estate market and the specific facts that plaintiff knew in 1983 would have pursued his suspicion that the stock was undervalued and he was under a duty to exercise due diligence.

Having determined that plaintiff's cause of action under RICO and for fraud and conspiracy to defraud arose at the latest in March of 1983, the Court will apply the applicable statute of limitations. For claims arising under RICO, the applicable statute of limitations is four years. *Agency Holding Corporation v. Malley–Duff & Associates, Inc.*, —— U.S. ——, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987). The statute of limitations on plaintiff's cause of action ran, at the latest, in March of 1987. Since plaintiff filed his action in April 1987, his RICO claim is time-barred.

In the District of Columbia, the question of whether a statute of limitations bars an action is procedural and, therefore, is governed by the forum's statute of limitations. *Steorts v. American Airlines*, 647 F.2d 194, 197 (D.C.Cir.1981). Under local law in the District of Columbia, an action alleging fraud must be brought within three years of accrual of the cause of action. Plaintiff's claims for fraud and conspiracy accrued at the same time as the RICO claims. The statute of limitations, however, ran in 1986. Accordingly plaintiff's claims of fraud and conspiracy are time-barred.

## IV. *Statute of Limitations Applicable to Remaining Claims*

■ The general statute of limitations period for the District of Columbia governs the remaining claims. D.C.Code § 12–301. Count III alleges violations of the Uniform Commercial Code ("U.C.C."), which governs disposition of collateral upon default.

---

**11.** *See supra* fn. 8.

**12.** Sally Arthur stated that

I advised plaintiff to wait until 1981, at which time the corporations would probably have the necessary funds to entertain [the bid/buy-back or corporate repurchase alternatives] in view of an anticipated significant increase in RWC ground lease payments. Moreover, I pointed out that increased RWC

income would permit correspondingly increased dividends to shareholders.
Sally Arthur Aff. ¶ 7.

**13.** *See Norris v. Wirtz*, 818 F.2d 1329, 1334 (7th Cir.1987), *petition for cert. filed*, September 4, 1987 (holding that 18 year old girl inexperienced in business matters still held to reasonable person standard and would need to exercise due diligence).

D.C.Code § 28:9–504. The general limitations statute provides a limitations period of either one year, D.C.Code § 12–301(5), or three years, D.C.Code § 12–301(8), from the date of accrual. Plaintiff's cause of action accrued when Jean Riddell foreclosed on the stock in the summer of 1981, or at the latest, in the early spring of 1983 when he learned of the sale of the stock to the corporations. Complaint ¶ 23, Roland Dep. 33. Thus, the statute of limitations on plaintiff's cause of action ran at the very latest in 1986 and plaintiff is time-barred.

Count IV alleges conversion. The statute of limitations for conversion is three years. D.C.Code § 12–301(2). Any conversion occurred when Jean Riddell foreclosed on the stock in 1981. Thus, the limitations period ran in 1984.[14] Count V alleges breach of contract. Specifically, plaintiff maintains Jean Riddell breached her duty of good faith and fair dealing when she foreclosed on the note. Under local law, a three year statute of limitations applies, D.C.Code § 12–301(7), which runs from the date of the breach. *Prouty v. National Railroad Passenger Corp.*, 572 F.Supp. 200, 205 (D.D.C.1983). The breach, if one did occur, took place when Jean Riddell foreclosed on the stock. Accordingly, the statute of limitations ran in 1984.

Count VI alleges that Jean Riddell breached her fiduciary duty to plaintiff. The applicable statute of limitations is three years. D.C.Code § 12–301(8). For the same reasons as the breach of contract claim, this cause of action is time-barred.[15] Finally, Count VII alleges that Jean Riddell wrongfully transferred plaintiff's stock to the corporations. This claim is subject to a three year statute of limitations. D.C.Code §§ 12–301(2) or (8). A wrongful transfer action occurs upon the unauthorized transfer which in this case was upon foreclosure

of the stock. As such, plaintiff is time-barred.

In accordance with the foregoing discussion, it is this 18th day of November, 1987,

ORDERED that defendant's motion for summary judgment is granted and this case is dismissed with prejudice.

---

**14.** Plaintiff claims the conversion occurred in November 1981 when Jean Riddell sold the stock as owner, versus as secured party, to the corporation. Plaintiff's attempts to distinguish an owner versus a secured party are ineffective. Jean Riddell properly foreclosed on the stock in the summer of 1981, a full three years after plaintiff first defaulted on the loan. Any wrongful conversion that may have occurred did so at that time.

**15.** In his amended complaint plaintiff incorporates Sally Arthur and Robert Arthur into his breach of fiduciary duty claim. The Court's decision would still be the same for the reasons expressed under the discussion of fraud.